[L.A. No. 31126. May 15, 1980.]

CITY OF SANTA BARBARA, Plaintiff and Respondent, v.
BEVERLY ADAMSON et al., Defendants and Appellants.

124

COUNSEL

Meaney & Bycel, Benjamin Bycel and Bruce William Plebuch for Defendants and Appellants.

William A. Resneck, Reed & Resneck, Fred Okrand, Mark O. Rosenbaum and Terry Smerling as Amici Curiae on behalf of Defendants and Appellants.

Frederick W. Clough, City Attorney, Anthony C. Fischer, Assistant City Attorney, and James O. Kahan, Deputy City Attorney, for Plaintiff and Respondent.

Burt Pines, City Attorney (Los Angeles), Claude E. Hilker and William B. Burge, Assistant City Attorneys, Ann Hayes, Deputy City Attorney, Robert W. Parkin, City Attorney (Long Beach), Arthur Y. Honda, Deputy City Attorney, Donald S. Greenberg, City Attorney (San Buenaventura), Elwyn L. Johnson, City Attorney (Modesto), George D. Lindberg, City Attorney (Chula Vista), William C. Marsh, City Attorney (Monterey), Stanley E. Remelmeyer, City Attorney (Torrance), James M. Ruddick, City Attorney (Marysville), Robert R. Wellington, City Attorney (Marina, Del Rey Oaks), John W. Witt, City Attorney (San Diego), and D. Dwight Worden, City Attorney (Del Mar), as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

NEWMAN, J.—"All people . . . have inalienable rights", proclaims the California Constitution in the first sentence of article I. The second sentence reads: "Among these [inalienable rights] are enjoying . . . life and liberty, . . . possessing . . . property, and pursuing and obtaining . . . happiness, and privacy."[1]

Appellants argue that Santa Barbara and the trial court have violated those rights because the court, on request of the city, ordered appellants to comply with a city ordinance which requires, in the zone where appellants and other individuals live together, that all occupants of houses like that in which they reside be members of a family.

[1]The full text of article I, section 1 is as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

Regarding "happiness" see the concurring opinion of Field, J. in *Butchers' Union Co. v. Crescent City Co.* (1884) 111 U.S. 746, 754, 759 [28 L.Ed. 585, 589, 592, 4 S.Ct. 652] ("to secure to every one the right to pursue his happiness unrestrained, except by just, equal, and impartial laws"); cf. *Ex parte Drexel* (1905) 147 Cal. 763, 764 [82 P. 429]; *State v. Cromwell* (1943) 72 N.D. 565 [9 N.W.2d 914, 918].

Section 28.10.030 of the ordinance commands that no premises be used "in any manner other than is permitted in the zones in which such . . . premises are located." Other sections describe the zones; those most directly involved here are the one-family, two-family, and multiple-family residence zones. The trial court concluded that appellants may not reside in such zones because they and individuals with whom they wish to live are not within the ordinance's definition of "family":

"28.04.230 *Family.*

"1.   An individual, or two (2) or more persons related by blood, marriage or legal adoption living together as a single housekeeping unit in a dwelling unit. . . .

"2.   A group of not to exceed five (5) persons, excluding servants, living together as a single housekeeping unit in a dwelling unit."

The record shows that appellants are three residents of a house in a single-family zone where the minimum lot-size is one acre. They and other individuals form a group of 12 adults who live in a 24-room, 10-bedroom, 6-bathroom house owned by appellant Adamson. The occupants are in their late 20's or early 30's and include a business woman, a graduate biochemistry student, a tractor-business operator, a real estate woman, a lawyer, and others. They are not related by blood, marriage, or adoption.

They moved into the house after Adamson acquired it on December 1, 1977. On February 9, 1978, following warnings, the city attorney sued for a temporary restraining order, preliminary injunction, and permanent injunction. A restraining order was issued on March 7, 1978; a preliminary injunction on March 29, 1978.

Appellants' household illustrates the kind of living arrangements prohibited by the ordinance's rule-of-five. (§ 28.04.230, subd. 2, *supra.*) They chose to reside with each other when Adamson made it known she was looking for congenial people with whom to share her house. Since then, they explain, they have become a close group with social, economic, and psychological commitments to each other. They share expenses, rotate chores, and eat evening meals together. Some have children who regularly visit. Two (not including Adamson) have contributed over $2,000 each to improving the house and defraying costs of this lawsuit. Emotional support and stability are provided by the members to each other; they enjoy recreational activities such as a trip to Mexico togeth-

er; they have chosen to live together mainly because of their compatibility.

Regarding physical environment, the house has 6,231 square feet of space and is hidden from the street by trees and a fence. It has off-street parking for at least 12 cars. Appellants have built a wall around part of the property and a new, private driveway to help isolate them from neighbors' houses. There is no evidence of overcrowding though, after appellants had arrived, some neighbors did notice a larger number of cars parked on the property and an understandable increase in the number of residents.

Appellants say that they regard their group as "a family" and that they seek to share several values of conventionally composed families. A living arrangement like theirs concededly does achieve many of the personal and practical needs served by traditional family living. It could be termed an alternate family. It meets half of Santa Barbara's definition because it is "a single housekeeping unit in a dwelling unit." It fails to meet the part of the definition that requires residents, if they are more than five and are not servants, to be related by blood, marriage, or adoption.

## THE ORDINANCE'S RESTRICTIONS

Valid laws can, of course, be written to help promote and protect values that family life enhances. The question in this case is whether that kind of law may deny to individuals who are not family members certain benefits that family members enjoy.

The ordinance at issue is 93 pages long. The words "family" and "families" are used at least 85 times. Because of various phrases in which the words are used it appears that, in Santa Barbara, appellants and their associates are denied the right to reside together in a one-family, two-family, or multiple-family dwelling, a "garden apartment development," and "a trailer or cabana or combination thereof." Other possible abodes not adaptable to their needs include hotel ("the more or less temporary abiding place of individuals who are lodged"), tourist court ("designated for...[use] temporarily by automobile tourists or transients"), and auto trailer ("designed...to travel on the public thoroughfares at the maximum allowable speed limit").

Where then, according to the ordinance, might they reside together? Apparently nowhere, with three exceptions: *First*, if any five or less of them were acceptable as masters, perhaps the others then could sign on as servants. (See § 28.04.230, which in part defines family as any "group of not to exceed five (5) persons, excluding servants...";  cf. § 28.04.180: "all necessary servants and employees of such family." The legality of such clauses has not been argued here, but they appear to present equal protection questions.)

*Second*, if appellants could meet the requirements of section 28.94.001 they then might obtain from the Planning Commission a conditional use permit to maintain a boarding house in another zone, unlike where they now reside. (See § 28.94.030, subd. 17; also § 28.04.100, stating that a boarding house is "[a] building where meals and/or lodging are provided for compensation for six (6) or more persons by pre-arrangement for definite periods.")

*Third*, they might apply for a variance pursuant to chapter 28.92 of the ordinance. (We discuss below this suggestion of the city attorney, as well as his "boarding house" suggestion.)

Do the ordinance's restrictions, with those three exceptions, respect the commands of the California Constitution concerning people's rights to enjoy life and liberty, to possess property, and to pursue and obtain happiness and privacy?

Our leading precedent on privacy is *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], where this court observed that "the general concept of privacy relates, of course, to an enormously broad and diverse field of personal action and belief...." (*Id.*, pp. 773-774; and see fn. 10 regarding "the wide variety of contexts in which the constitutional privacy analysis has been employed"; Bostwick, *A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision* (1976) 64 Cal.L.Rev. 1447, 1450: "Prosser, as a specialist on torts, focused his analysis on harm-causing activities that were proscribed rather than on zones to be protected. The [United States] Supreme Court rapidly outpaced his summary of the law of privacy and a new attempt at classification became necessary." See too *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89, 98 [130 Cal.Rptr. 375], *re* ban against unmarried cohabiting adults.)

The court in *White* v. *Davis* quoted these words from "a statement drafted by the proponents of the provision [that added 'privacy' to the California Constitution] and included in the state's election brochure" (13 Cal.3d at pp. 774-775): "'The right of privacy is the right to be left alone. *It is a fundamental and compelling interest.* It protects our *homes,* our *families,* our thoughts, our emotions, our expressions, our personalities, our *freedom of communion,* and our *freedom to associate with the people we choose* . . . . [¶] The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. *This right should be abridged only when there is a compelling public need* . . . .'" (Italics added.)

That ballot argument evidenced the voters' intent in 1972 to ensure a right of privacy not only in one's family but also in one's home.[2] The question now is whether that right comprehends the right to live with whomever one wishes[3] or, at least, to live in an alternate family with persons not related by blood, marriage, or adoption.

---

[2] Cf. article 12 of the Universal Declaration of Human Rights: "No one shall be subject to arbitrary interference with his privacy, family, home or correspondence, nor to attacks upon his honour and reputation. Everyone has the right to the protection of the law against such interference or attacks." Article 16(3) reads: "The family is the natural and fundamental group unit of society and is entitled to protection by society and the State." Article 17(1): "Everyone has the right to own property alone as well as in association with others."

See too article 29(2): "In the exercise of his rights and freedoms, everyone shall be subject only to such limitations as are determined by law solely for the purpose of securing due recognition and respect for the rights and freedoms of others and of meeting the just requirements of morality, public order and the general welfare in a democratic society."

[3] Cf. Justice Marshall's dissenting opinion in *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 16 [39 L.Ed.2d 797, 808, 94 S.Ct. 1536]: "The choice of household companions—of whether a person's 'intellectual and emotional needs' are best met by living with family, friends, professional associates, or others—involves deeply personal considerations as to the kind and quality of intimate relationships within the home. That decision surely falls within the ambit of the right to privacy protected by the Constitution."

Even if Justice Douglas's majority opinion in *Belle Terre* still does declare federal law, the federal right of privacy in general appears to be narrower than what the voters approved in 1972 when they added "privacy" to the California Constitution. (See Cal. Const., art. I, § 24; *White* v. *Davis, supra,* 13 Cal.3d at pp. 774-775.)

Concerning uncertainty as to current federal law see Tribe, American Constitutional Law (1978) § 15-18, p. 974, § 15-21, p. 989; Carlin, *Moore v. City of East Cleveland: Freedom of Personal Choice for the Extended Family* (1978) 10 Sw.U.L.Rev. 651; Perry, *Modern Equal Protection: A Conceptualization and Appraisal* (1979) 79 Colum.L.Rev. 1023, 1073; Comment (1978) 91 Harv.L.Rev. 1427, 1576-1578.

Ends and Means

■ As was indicated in the foregoing excerpt from the 1972 ballot pamphlet and stressed by the unanimous court in *White* v. *Davis, supra,* "the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling [public] interest." (13 Cal.3d at p. 775.) Has Santa Barbara demonstrated that, in fact, such an interest does underlie its decision to restrict communal living?

The over-all intent of the ordinance, according to section 28.01.001, is "to serve the public health, safety, comfort, convenience and general welfare and to provide the economic and social advantages resulting from an orderly planned use of land resources, and to encourage, guide and provide a definite plan for future growth and development of said City." By themselves those words hardly justify the restrictions that appellants contest here.

A more specific intent, underlying the setting-up of two-family and multiple-family zones, as well as "garden apartment," "planned residence," and "planned unit" developments, is "to establish, maintain and protect the essential characteristics of the district, to develop and sustain a suitable environment for family life, and to prohibit activities of a commercial nature and those which would tend to be inharmonious with or injurious to the preservation of a residential environment." (See §§ 28.18.001, 28.21.001, 28.21.005(1), 28.30.032, 28.33.030, and 28.36.030.)

---

See also Williams & Doughty, *Studies in Legal Realism: Mount Laurel, Belle Terre and Berman* (1975) 29 Rutgers L.Rev. 73, 74: "The New Jersey Supreme Court is beginning to deal realistically with major problems of the mid-1970's; the United States Supreme Court, rather surprisingly, is still merely repeating what were the fashionable liberal shibboleths of the mid-1930's."

For us the question is one of first impression. (Cf. Justice Tobriner's majority opinion in *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604, fn. 22 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], which observes that "both the majority and the dissenting opinion in [*Village of Belle Terre* v.] *Boraas* support our conclusion" but does not examine rights of privacy or article I, section 1 of the California Constitution. (See too *Palo Alto Tenants Union* v. *Morgan* (N.D.Cal. 1970) 321 F.Supp. 908, 911.)

Concerning the possible breadth of the phrase "single family dwelling" see Justice Tobriner's opinion in *Brady* v. *Superior Court* (1962) 200 Cal.App.2d 69, 77-82 [19 Cal.Rptr. 242]. (Cf. conc. opn. of Stevens, J. in *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 513, 516-519 [52 L.Ed.2d 531, 546, 547-550, 97 S.Ct. 1932]; and see Smith, "*Burning the House to Roast the Pig": Unrelated Individuals and Single Family Zoning's Blood Relation Criterion* (1972) 58 CornelL.Rev. 138, 161.)

For one-family zones, section 28.15.005 specifies additionally the kind of family life "where children are members of most families." ("These zones are restricted residential districts of low density in which the principal use of land is for single-family dwellings; together with recreational, religious and educational facilities required to serve the community. The regulations for these districts are designated and intended to establish, maintain and protect the essential characteristics of the district, to develop and sustain a suitable environment for family life where children are members of most families, and to prohibit all activities of a commercial nature and those which would tend to be inharmonious with or injurious to the preservation of a residential environment.")

Does the ordinance's rule-of-five truly and substantially help effect those goals? Looking first at the final two words in section 28.15.005 (just quoted), is a "residential environment" in fact dependent on a blood, marriage, or adoption relationship among the residents of a house? Is transiency, for example, determined by lack of any biological or marriage relation among the residents? We are not persuaded by facts presented here.

Regarding "low density" (in the first sentence of § 28.15.005) the ordinance limits only the number of unrelated residents. It does not limit the number of related residents, or of servants. It does not appear to have been designed to prevent overcrowding, which may be a legitimate zoning goal. It proscribes some groups that in their homes are not crowded; yet, simply because the members are related, it leaves uncontrolled some groups that are crowded.

The city argues that related groups tend to have a natural limit, making a legal limit unnecessary; and data on average-size families are presented. Comparable data have not been presented, however, on the average sizes of unrelated groups who live as single housekeeping-units; and, at best, density control is achieved quite indirectly, if at all, by regulating only the size of unrelated households.

Other aims of the ordinance's restrictions are to maintain "the essential characteristics of the districts" and "a suitable environment for family life where [in single-family zones only] children are members of most families." But the rule-of-five is not pertinent to noise, traffic or parking congestion, kinds of activity, or other conditions that conceiv-

ably might alter the land-use-related "characteristics" or "environment" of the districts.

The rule-of-five might reflect an assumption that an unrelated group will be noiser, generative of more traffic and parking problems, or less stable than a related group of the same size. "But none of these observations reflects a universal truth. Family groups are mobile today, and not all family units are internally stable and well-disciplined. Family groups with two or more cars are not unfamiliar." (*City of Des Plaines* v. *Trottner* (1966) 34 Ill.2d 432 [216 N.E.2d 116, 119]; see also *State* v. *Baker* (1979) 81 N.J. 99 [405 A.2d 368, 372].)

Is another assumption behind the rule, perhaps, that groups of unrelated persons hazard an immoral environment for families with children? That implied goal would not be legitimate. (See *Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89, 97 [130 Cal.Rptr. 375], holding invalid an irrebuttable presumption in a public housing regulation that unmarried cohabitation is immoral, irresponsible, or demoralizing to tenant relations; *U.S. Dept. of Agriculture* v. *Moreno* (1973) 413 U.S. 528, 534-535, fn. 7 [37 L.Ed.2d 782, 788, 93 S.Ct. 2821] ("hippies"): cf. Willemsen, *Justice Tobriner and the Tolerance of Evolving Lifestyles: Adapting the Law to Social Change* (1977) 29 Hastings L.J. 73.)

Finally, could not each of the city's stated goals be enhanced by means that are less restrictive of freedom than is the rule-of-five? To illustrate, "residential character" can be and is preserved by restrictions on transient and institutional uses (hotels, motels, boarding houses, clubs, etc.). Population density can be regulated by reference to floor space and facilities. Noise and morality can be dealt with by enforcement of police power ordinances and criminal statutes. Traffic and parking can be handled by limitations on the number of cars (applied evenly to all households) and by off-street parking requirements. *In general, zoning ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users.* (Cf. *Shepard* v. *Woodland Tp. Committee & Planning Bd.* (1976) 71 N.J. 230 [364 A.2d 1005, 1015-1016].)

Some courts, confronting restrictions similar to the rule-of-five here, have redefined "family" to specify a concept more rationally and substantially related to the legitimate aim of maintaining a family style of

living. For example, in New Jersey a valid regulation of single-family dwellings would be "a reasonable number of persons who constitute a *bona fide* single housekeeping unit." (*Berger* v. *State* (1976) 71 N.J. 206 [364 A.2d 993, 1003]; see also *State* v. *Baker, supra*, 405 A.2d 368, 371-372: "The fatal flaw in attempting to maintain a stable residential neighborhood through the use of criteria based upon biological or legal relationships is that such classifications operate to prohibit a plethora of uses which pose no threat to the accomplishment of the end sought to be achieved. Moreover, such a classification system legitimizes many uses which defeat that goal. . . . As long as a group bears the 'generic character of a family unit as a relatively permanent household,' it should be equally as entitled to occupy a single family dwelling as its biologically related neighbors. *City of White Plains* [v. *Ferraiolo* (1974) 34 N.Y.2d 300, 306 (357 N.Y.S.2d 449, 313 N.E.2d 756)]." (Cf. *Incorp. Village of Freeport* v. *Association, etc.* (1977) 94 Misc.2d 1048 [406 N.Y.S.2d 221, 223].[4])

We do not here address the question, How many people should be allowed to live in one house? (Cf. § 28.87.030(4b) of the ordinance, which concerns density and prohibits "increase in the intensity of. . . [a] nonconforming use," including "[i]ncrease in the number of persons . . . which has a detrimental effect on the surrounding community.") We merely hold invalid the distinction effected by the ordinance between (1) an individual or two or more persons related by blood, marriage, or adoption, and (2) groups of more than five other persons.

### CONDITIONAL USE PERMIT?

■ Santa Barbara contends that appellants might preserve their life style by moving out of the one-family zone and seeking a permit in a two- or multiple-family zone for a boarding house ("[a] building where meals and/or lodging are provided for compensation for six (6) or more persons by pre-arrangement for definite periods"—§ 28.04.100).

Boarding-house use is described as one of the uses that "possess characteristics of unique and special form. . . [which] make impractical their

---

[4]Owners with aims like those of Ms. Adamson are, of course, subject to many restrictions applicable to lessors generally. See, e.g., in the Fair Housing Law, Health and Safety Code section 35710, subdivision (d): "The term 'discrimination' does not include refusal to rent or lease a portion of an owner-occupied single-family house to a person as a roomer or a boarder living within the household, *provided that no more than one roomer or boarder is to live within the household.*" (Italics added.)

being automatically included in classes of use as set forth in the various zones herein defined." (§ 28.94.001.) The permit may issue only if the boarding house "is deemed essential or desirable to the public convenience or welfare and is in harmony with the various elements or objectives of the Comprehensive General Plan; and...it is determined that such [use] will not be materially detrimental to the public peace, health, safety, comfort and general welfare and will not materially affect property values in the particular neighborhood"; also, "the Planning Commission may impose other conditions and restrictions upon the proposed use consistent with the Comprehensive General Plan and may require bonding...." (*Id.*)

The city's contention that, pursuant to those and other rules, appellants should seek a permit lacks merit. Troubling questions arise with respect to (1) the justification for requiring that permit procedures be "exhausted" when the constitutional attack on the ordinance is meritorious (cf. *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 250-251 [115 Cal.Rptr. 497, 524 P.2d 1281]), (2) the reasonableness of requiring that appellants not reside in a one-family zone, (3) the great breadth of city officials' discretion to deny the permit, and (4) the rationality of presuming that Ms. Adamson in fact does operate a "boarding house."[5] (See too *People* v. *Perez* (1963) 214 Cal.App.2d Supp. 881, 885 [29 Cal.Rptr. 781] (re permit procedure: "To be valid it should be limited to those uses only for which it is difficult to specify adequate conditions in advance").) Those questions have not been addressed persuasively in the briefs submitted by the city attorney and amici who support his contentions here.

### VARIANCE?

■ Chapter 28.92 of the ordinance contains these sections: "28.92.010 Variances.

"When practical difficulties, unnecessary hardships or results inconsistent with the general purposes of this chapter occur by reason of a

---

[5]Cf. section 28.04.170, which states that a boarding house is not a "dwelling." Even more meritless than the boarding-house proposal are (1) the proposal that Ms. Adamson seek a room-rental permit under section 28.94.030(1), and (2) the suggestion that her and her associates' relationship is akin to membership in a social club or fraternity. Cf. section 28.04.150 ("the purpose of [a club]...is to render a service customarily rendered for members and their guests"); section 28.94.030(12) ("[n]ormal clubhouse facilities"); section 28.94.034 ("clubs providing primarily indoor recreation facilities rather than outdoor facilities are prohibited"); section 28.94.031(21) ("Fraternity and sorority houses in the R-2 Zones").

strict interpretation of any of the provisions of this chapter, either the Planning Commission or City Council may upon its own motion, or the Planning Commission upon the verified application of any property owner or authorized agent shall, in specific cases, initiate proceedings for the granting of a variance from the provisions of this chapter under such conditions as may be deemed necessary to assure that the spirit and purposes of this chapter will be observed, public safety and welfare secured, and substantial justice done. All acts of the Planning Commission and City Council under the provisions of this section shall be construed as administrative acts performed for the purpose of assuring that the intent and purpose of this chapter shall apply in special cases, as provided in this section, and shall not be construed as amendments to the provisions of this chapter or map. Individual economic circumstances are not a proper consideration for the granting of a variance."

"28.92.013 Necessary Conditions.

"Before a variance may be granted all of the following shall be shown:

"1. That there are exceptional or extraordinary circumstances or conditions applicable to the property involved, or to the intended use of the property, that do not apply generally to the property or class of use in the same zone or vicinity.

"2. That the granting of such variance will not be materially detrimental to the public welfare or injurious to the property or improvements in such zone or vicinity in which the property is located.

"3. That such variance is necessary for the preservation and enjoyment of a substantial property right of the applicant possessed by other property in the same zone and vicinity.

"4. That the granting of such variance will not adversely affect the Comprehensive General Plan."

The city attorney argues as follows (in his letter-brief dated Jan. 11, 1980): "Assuming that an Applicant can demonstrate that a group of more than five unrelated persons will not be adverse to the purposes of the Zoning Ordinance due to measures taken by the Applicant in establishing and regulating the group, the proposed use would have the extraordinary circumstances or conditions sufficient to allow more than five unrelated persons."

Further (as to the requirement that city officials find the variance necessary for the preservation and enjoyment of a substantial property right of the applicant possessed by other property in the same zone and vicinity), "[t]his finding can be made by a showing that owners of other homes and lots in the same zone and vicinity can use the home by [*sic*?] an unlimited number of related persons."

Finally, "[t]he second and fourth findings will depend upon the precise site selected, the information developed as part of the review process and whether conditions on the approval could be devised to remove any inconsistency with the findings. For example, an investigation may reveal that the area has adequate public parks, utilities, street capacity, or that a condition mitigating the injurious impact may be imposed. If water availability is a problem, it may be possible to require water conservation. If street capacity is a problem, a limit on average daily trips may be possible."

Those arguments are erratically remote from the significant facts of this case. Also, again, questions arise as to (1) the appropriateness of requiring here that administrative procedures be "exhausted," and (2) the breadth of city officials' discretion. (Cf. Judge Renfrew's comment in *Dahl* v. *City of Palo Alto* (N.D.Cal. 1974) 372 F.Supp. 647, 649: "It is highly improbable that a variance would, or legally could, be granted...."; and see *Cow Hollow Improvement Club* v. *Board of Permit Appeals* (1966) 245 Cal.App.2d 160, 178 [53 Cal.Rptr. 610] (to allow an R-2 use in an R-1 zone is "tantamount to an amendment of the zoning regulations in the guise of granting a variance"); § 28.87.030(2) of the ordinance ("amendment after a recommendation...from the Planning Commission"); Cal. Zoning Practice (Cont.Ed.Bar Supp. 1978) § 7.54, p. 152 ("[c]ities may expect rigorous review of variances even if zoning is enacted under their charter powers"); *Moore* v. *East Cleveland* (1977) 431 U.S. 494, 512-513 [52 L.Ed.2d 531, 545-546, 97 S.Ct. 1932] (conc. opn. of Brennan, J.): "[T]he existence of the variance procedure serves to lessen neither the irrationality of the definition of 'family' nor the extent of its intrusion into family life-style decisions.... We have now passed well beyond the day when illusory escape hatches could justify the imposition of burdens on fundamental rights.")

### CONCLUSION

The order granting the preliminary injunction is reversed. The case is remanded for further proceedings consistent with this opinion.

Bird, C. J., Tobriner, J., and Mosk, J., concurred.

MANUEL, J.—I dissent.

The majority opinion, casting the City of Santa Barbara—and presumably the at least 37 other cities which have similar zoning ordinances[1]—in the sinister role of antagonist to the "alternate family," radically distorts the meaning, purpose, and intention of the provisions we here consider. The Santa Barbara ordinances, it must be emphasized, *do not* preclude or impede the establishment of communal living arrangements in the single-family zones of the city. On the contrary they expressly permit such arrangements, simply imposing a numerical limitation thereon. Thus, the ordinances provide, a "family" for zoning purposes is either a traditional family (i.e., one composed of persons related by blood, marriage, or legal adoption), or what the majority terms an "alternate" family—one which, in the langauge of the ordinance, comprises "[a] group of not to exceed five (5) persons, excluding servants, living together as a single housekeeping unit in a dwelling unit." (§ 28.04.230.)

---

[1] Amicus curiae City of Los Angeles advises us in its brief that the following California cities have adopted a definition of "family" in their zoning ordinances which is identical to that adopted by Santa Barbara:
1. Auburn: Municipal Code section 9-4.137
2. Azusa: Municipal Code section 19.04.300
3. Baldwin Park: Municipal Court section 9426(f) 1
4. Bell: Municipal Code section 9211(F)2
5. Burlingame: Municipal Code section 25.08.260
6. Camarillo: Municipal Code section 19.04.310
7. Carlsbad: Municipal Code section 21.04.145
8. Chula Vista: Municipal Code section 19.04.092
9. Colusa: Zoning Ordinance No. 191, section 4.25
10. Corte Madera: Municipal Code section 18.09.105
11. Crescent City: Zoning Ordinance section 30-700.36
12. Davis: Municipal Code section 24-1, article 4
13. Del Mar: Municipal Code, Chapter 30, section 30-32
14. Del Rey Oaks: Municipal Code section 11-217.1
15. Downey: Municipal Code section 9104.96
16. El Cajon: Municipal Code section 17.04.390
17. Hidden Hills: Municipal Code 47, section 1.17
18. Long Beach: Municipal Code section 9120.2
19. Los Angeles: Municipal Code, chapter 1, article 2, section 12.03
20. Manhattan Beach: Municipal Code, section 10-3.234
21. Modesto: Municipal Code section 10.2.502(d)1
22. Montebello: Municipal Code section 9202.6(F)1
23. Monterey: City Code section 2.08, appendix A
24. Monterey Park: Municipal Code section 21.04.275
25. Palos Verdes Estates: Municipal Code section 18-2.17

The majority, perceiving in these provisions some sort of dark animus against nontraditional living arrangements,[2] concludes that here at stake is "the right to live with whomever one wishes or, at least, to live in an alternate family with persons not related by blood, marriage, or adoption." (Majority opn., *ante*, at p. 130; fn. omitted.) As I read the ordinances, that right is expressly granted. The question before us, then, is whether those ordinances, insofar as they limit the *number* of unrelated persons who may live in a single dwelling unit, violate any cognizable constitutional rights.

It is clear that no rights guaranteed by the federal Constitution are offended. In the comparatively recent case of *Village of Belle Terre* v. *Boraas, supra* 416 U.S. 1, the United States Supreme Court addressed a challenge to the constitutional validity of an ordinance which, like that here before us, permitted unrelated persons to live together "as a single housekeeping unit" in a single-family zone but placed a numerical limit on such "alternate" arrangements. The ordinance was challenged on a number of constitutional grounds, including due process, the right to travel, and the rights of free association and privacy. The court held, however, that the case involved "no 'fundamental' right guaranteed by the Constitution...." (*Id.*, at pp. 7-8 [39 L.Ed.2d at p. 803].) Therefore, the court concluded, the test to be applied in determining whether the legislative body had exceeded the scope of its constitutional power was that normally applied to "economic and social legislation" of this kind—i.e., whether it bore a rational relationship to

---

26. Richmond: Municipal Code section 15.04.040
27. Riverside: Municipal Code section 19.04.138
28. San Diego: Municipal Code section 101.0407 (B1-B5); section 101.0101.20
29. San Francisco: Municipal Code, part II, chapter II section 102.8
30. Santa Barbara: Municipal Code section 28.04.230(2)
31. Santa Cruz: Municipal Code section 24.10.354; section 24.16.300-341
32. Simi Valley: Zoning Ordinance No. 8170-25
33. Thousand Oaks: Municipal Code section 9-4.230
34. Torrance: Municipal Code section 91.2.24(b)
35. Vallejo: Municipal Code section 16.04.170
36. Vista: City Code, appendix A, Zoning Ordinance section 238
37. Whittier: Municipal Code section 9111.(f)2

[2]Indeed it is even suggested, albeit by rhetorical question, that one motive underlying Santa Barbara's zoning ordinances might have been a fear "that groups of unrelated persons [might] hazard an immoral environment for families with children." (Majority opn., *ante*, at p. 133.) I have difficulty understanding the relevance of such an observation in a case where the subject ordinances explicitly permit "groups of unrelated persons" to live together in a single-family zone. (See also *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804, 94 S.Ct. 1536].)

a permissible state objective. (*Id.*, at p. 8 [39 L.Ed.2d at p. 803].) This, in the view of the high court, it did. Dismissing the contention that the numerical limit (*two* in that case) on "alternative" family groups was arbitrary,[3] it went on to say: "The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." (*Id.*, at p. 9 [39 L.Ed.2d at p. 804].)

The high court expanded on this theme in the case of *Moore* v. *East Cleveland* (1977) 431 U.S. 494 [52 L.Ed.2d 531, 97 S.Ct. 1932]. There the zoning ordinance in question defined "family" in restrictive terms, excluding not only "alternate" family arrangements but members of the extended natural family as well—in this case a woman's grandson. This, the court held, was impermissible. Justice Powell, speaking for a plurality of the court, distinguished *Belle Terre*, noting that whereas the ordinance in that case promoted family needs and values, the East Cleveland ordinance had "chosen to regulate the occupancy of its housing by slicing deeply into the family itself." (*Id.*, at p. 498 [52 L.Ed.2d at p. 537].) Thus, the court suggested, whereas the demands of due process do not trench upon the power of a city to limit and tailor the use of family zones by persons other than those having natural family ties to one another, the situation is quite different when the zoning power was utilized so as to impinge unreasonably on natural family relationships. "When a city undertakes such intrusive regulation of the family, neither *Belle Terre* nor *Euclid* [v. *Ambler Realty Co.* (1926) 272 U.S. 365 (71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016)] governs; the usual judicial deference to the legislature is inappropriate." (*Id.*, at p. 499 [52 L.Ed.2d at p. 537].)

Justice Brennan, joining in the plurality opinion but adding a word in concurrence, stated the distinction thus: "Indeed, *Village of Belle Terre* v. *Boraas*, 416 U.S. 1 (1974), the case primarily relied upon by [the city], actually supports the Court's decision. The Belle Terre ordinance barred only unrelated individuals from constituting a family in a single-family zone. The village took special care in its brief to emphasize that its ordinance did *not* in any manner inhibit the choice of *related* indi-

---

[3]"It is said, however, that if two unmarried people can constitute a 'family,' there is no reason why three or four may not. But every line drawn by a legislature leaves out some that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function." (*Village of Belle Terre* v. *Boraas, supra*, 416 U.S. 1, 8 [39 L.Ed.2d 797, 803-804], fn. omitted.)

viduals to constitute a family, whether in the 'nuclear' or 'extended' form. This was because the village perceived that choice as one it was *constitutionally powerless to inhibit.*" (*Id.*, at p. 511 [52 L.Ed.2d at pp. 544-545], final emphasis added.) The implication of this statement, in light of the express holding in *Belle Terre*, is clear.

The distinction drawn by the *Belle Terre* and *Moore* cases has never been better expressed than it was in a case which, although antedating them by some four years, clearly anticipated their rationale. In *Palo Alto Tenants Union* v. *Morgan* (N.D.Cal. 1970) 321 F.Supp. 908, affd. (9th Cir. 1973) 487 F.2d 883, the court confronted a challenge to a city zoning ordinance similar in all relevant respects to that here before us. It was urged that because an ordinance placing restrictions on the use of an R-1 zone by "traditional" families might be deemed "highly suspect," the ordinance there at bench—placing numerical limitations on "alternate" family arrangements in such a zone—should be viewed with the same suspicion. The court disagreed: "[T]here is a long recognized value in the traditional family relationship which does not attach to the 'voluntary family'. The traditional family is an institution reinforced by biological and legal ties which are difficult, or impossible, to sunder. It plays a role in educating and nourishing the young which, far from being 'voluntary', is often compulsory. Finally, it has been a means, for uncounted millenia, of satisfying the deepest emotional and physical needs of human beings. A zoning law which divided or totally excluded traditional families would indeed be 'suspect'. [¶] The communal living groups represented by plaintiffs share few of the above characteristics. They are voluntary with fluctuating memberships who have no legal obligations of support or cohabitation. They are in no way subject to the State's vast body of domestic relations law. They do not have the biological links which characterize most families. Emotional ties between commune members may exist, but this is true of members of many groups. Plaintiffs are unquestionably sincere in seeking to devise and test new life-styles, but the communes they have formed are legally indistinguishable from such traditional living groups as religious communities and residence clubs. The right to form such groups may be constitutionally protected, but the right to insist that these groups live under the same roof, in any part of the city they choose, is not. To define 'association' so broadly...would be to dilute the effectiveness of that special branch of jurisprudence which our tradition has developed to protect the truly vital interests of the citizenry." (321 F.Supp. at pp. 911-912, fn. omitted.)

The majority, faced with the authorities delineated above, quite understandably chooses to shift their focus away from the protections offered by the federal Constitution. Turning instead to the comprehensive terms of article I, section 1 of the state Constitution, and seizing upon certain expansive general passages to be found in *White v. Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], they quickly and without significant discussion conclude that the right of privacy set forth in that provision "comprehends the right to live with whomever one wishes or, at least, to live in an alternate family with persons not related by blood, marriage, or adoption." (Majority opn., *ante*, at p. 130, fn. omitted.) Having thus discovered the "fundamental" right they seek, they then proceed to set in motion the mighty engine of strict scrutiny. The ordinance, needless to say, does not survive its batterings.

In my view the majority have proceeded a bit too hastily. The necessary condition precedent to the application of strict scrutiny, and the search for a "compelling state interest" which it entails, is the determination that the right at stake is one lodged in the fabric of our Constitution. That determination, in the context of the instant case, requires that we find that right to be one comprehended within the guarantee of privacy set forth in article I, section 1. The relevant authorities, in my view, do not support the conclusion that "the right to live with whomever one wishes or, at least, to live in an alternative family with persons not related by blood, marriage, or adoption" is one enjoying that status.

The leading case of *White v. Davis, supra,* was one involving a police department's covert intelligence gathering activities, which activities were challenged as an infringement of the then newly adopted state privacy guarantee. There, noting that "the full contours of the new constitutional provision have as yet not even tentatively been sketched" (13 Cal.3d at p. 773), we went on to provide such a sketch by indicating, through reference to election materials indicating the voters' intent, the broad area of concern within which the more detailed draftsmanship of judicial precedent was to occur. "Although the general concept of privacy relates, of course, to an enormously broad and diverse field of personal action and belief," we noted, *"the moving force behind the new constitutional provision was a more focussed privacy concern relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford*

*individuals some measure of protection against this most modern threat to personal privacy.*" (*Id.*, at pp. 773-774; italics added, fn. omitted.) We also noted "the principal 'mischiefs' at which the amendment is directed." They are: "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records." (*Id.*, at p. 775.)

In the recent case of *People* v. *Privitera* (1979) 23 Cal.3d 697 [153 Cal.Rptr. 431, 591 P.2d 919] it was contended that the state constitutional guarantee of privacy encompasses "a right to access to drugs of unproven efficacy." (*Id.*, at p. 709.) We held that it did not, pointing out that no such right was comprehended within the zone of privacy concern in which the amendment was designed to have effect. "In the absence of any evidence that the voters in amending the California Constitution to create a right of privacy intended to protect conduct of the sort engaged in by defendants, we have no hesitation in holding that section 1707.1 does not offend that constitutional provision." (*Id.*, at pp. 709-710.) (See also *People* v. *Davis* (1979) 92 Cal.App.3d 250, 260 [154 Cal.Rptr. 817].)

Similarly, I find no evidence of any kind that the voters, when they added the privacy provision found in article I, section 1, intended to establish a "right to live with whomever one wishes or, at least, to live in an alternate family with persons not related by blood, marriage, or adoption" (majority opn., *ante*, at p. 130)—such right to be preserved from all infringement except in those cases where a city can shoulder the unenviable burden of demonstrating some "compelling state interest" which justifies doing so. Accordingly, I conclude that the majority, in conferring "fundamental" constitutional status to the right it so describes, are in error. If the courts, in interpreting the privacy provision of our state Constitution, are to take upon themselves the function of determining when the wishes and desires of a particular group of people are to be accorded "fundamental" status—and thus invoke strict judicial scrutiny of legislation affecting such rights—the constitutional balance of our government will be radically dislocated. I do not believe that such a dislocation was intended by the voters of this state when they, out of a manifest concern for the excesses of governmental surveillance, adopted article I, section 1.

The familiar dictum of Chief Justice Marshall (*McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 406 [4 L.Ed. 579, 601]) bears renewed emphasis in cases of this kind. We deal here not with legislative wisdom but with constitutional principle. It may well be that an enlightened municipality, alert to the flow of social currents and the development of wholesome and valuable communal living arrangements outside the framework of the traditional family structure, might wish to tailor its zoning requirements in such a manner as to accommodate such arrangements on an essential parity with those of family groups. The City of Santa Barbara, to a significant extent, has done so, permitting such arrangements to coexist with family groups in its single-family zone, but placing a numerical limit on the size of such "alternate" groups—clearly with a view to imposing some limit on the size of living groups within the zone which are not subject to the normal biological and social limits of the natural family. It might well be that a legislator having the wisdom of Solomon would remove all such limits. That, however, is not the question before us. The question before us is whether the *failure* to remove them is *unconstitutional*. In my view, and as the cases which I have discussed above make clear, the answer to that question is decidedly no.

I would affirm the order.

Clark, J., and Richardson, J., concurred.

Respondent's petition for a rehearing was denied June 19, 1980. Clark J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.