[Civ. No. 18268. Fourth Dist., Div. One. Feb. 5, 1981.]

CITY OF CHULA VISTA, Plaintiff,
Cross-defendant and Respondent, v.
KENNETH L. PAGARD et al.,
Defendants, Cross-complainants and Appellants.

COUNSEL

Stickney, Ortlieb, Moats & Byrne and William S. Cannon for Defendants, Cross-complainants and Appellants.

Lee Boothby as Amicus Curiae on behalf of Defendants, Cross-complainants and Appellants.

George D. Lindberg, City Attorney, and Thomas J. Harron, Assistant City Attorney, for Plaintiff, Cross-defendant and Respondent.

Frederick W. Clough, City Attorney (Santa Barbara), and Anthony C. Fischer, Assistant City Attorney, as Amici Curiae on behalf of Plaintiff, Cross-defendant and Respondent.

OPINION

STANIFORTH, J.—After grant of hearing in this matter, the Supreme Court ordered the cause transferred to this court for reconsideration in light of *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436]. We now undertake such task.

Kenneth L. Pagard, pastor of the First Baptist Church of Chula Vista, and certain members of his church congregation conduct their lifestyle, as a matter of religious belief, in a manner requiring a "communal living arrangement." Pagard and his codefendants are heads of 12 such religious families located in Chula Vista. The City of Chula Vista (Chula Vista) sought an injunction to abate as a nuisance certain of these religious family households consisting of more than three and up to twenty-four unrelated individuals living in single-family dwellings in an R-1 zone in violation of Chula Vista's zoning ordinances.

The defendants answered and cross-complained, seeking to enjoin the enforcement of the disputed zoning ordinances and to compel the City Council of Chula Vista (Council) to reverse its decision declaring these religious family households to be a public nuisance. The parties filed cross-motions for summary judgment. After hearing, the trial court, relying upon *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1 [39 L.Ed.2d 797, 94 S.Ct. 1536], denied defendants' but granted Chula Vista's motion on the grounds no fundamental constitutional right was infringed by the zoning laws and the determination of the number of unrelated persons living within a single-family dwelling in an R-1 zone was a legislative matter. The court found, on undisputed evidence, defendants' households constituted a public nuisance and ordered them to come in full compliance with the Chula Vista ordinances governing R-1 zones within 60 days from the date of the judgment. Defendants appeal, contending the Chula Vista ordinance restricting the number of unrelated persons that can live together in a single household in an R-1 zone infringes constitutionally protected religious rights, rights to travel, rights to privacy and constitute a denial of equal protection of the law.

FACTS

Since 1969, the Chula Vista First Baptist Church has maintained communal households in single-family residences in Chula Vista's R-1 zone. As of November 1974, there were 12 such communal households with occupancy varying from 4 to 24 unrelated persons.[1]

---

[1]The following statistics throw some further light upon the physical setting of the 12 communes:

| Residence | Lot Size Sq. Ft. | Residents | Vehicles | Bedrooms |
|---|---|---|---|---|
| 456 Casselman Street | 9100 | 16 | 6 | 6 |
| 511 Casselman Street* | 6800 | 7 | 2 | 3 |
| 540 Madrona Street | 5980 | 14 | 3 | 6 |
| 174 Landis Avenue | 8180 | 8 | 2 | 6 |
| 1153 Nolan Avenue* | 8900 | 11 | 3 | 4 |
| 206 Fifth Avenue* | 6600 | 9 | 3 | 4 |
| 245 Ash Avenue* | 7200 | 9 | 2 | 5 |
| 424 Westby Street | 10270 | 24 | 7 | 7 |
| 57 Third Avenue | 8250 | 18 | 4 | 6 |
| 65 Mitscher Street | 10500 | 11 | 3 | 7 |
| 81 Mitscher Street* | 9600 | 8 | 4 | 5 |
| 487 Skyhill Court | 8890 | 4 | 2 | 6 |

---

*New since September 1974.

The 12 households have 41 cars for an average of 3.4 cars per house and 3.4 residents per car. The least number of cars at one household is two, the most is seven. These dwellings are, for the most part, "overcrowded," by any generally accepted standard.

During this period Chula Vista had by ordinance set aside its R-1 zone for the purpose of promoting and encouraging a suitable environment for family life. The Chula Vista ordinance defines "family" as an "individual; or two or more persons, all of whom are related by blood, marriage or adoption; or a group of not more than three persons, excluding servants, who need not be related, living in a dwelling unit as a single housekeeping unit and using common cooking facilities." (Ord. No. 19.04.092.)

Chula Vista delayed action to enforce its ordinance against these communal units in an R-1 zone due to the constitutional questions raised in a case then pending in the United States Supreme Court involving a similarly worded ordinance adopted by the Village of Belle Terre, New York. In 1974 the United States Supreme Court upheld the validity of the Belle Terre ordinance in *Village of Belle Terre* v. *Boraas, supra*, 416 U.S. 1. After the *Belle Terre* decision, but before the initiation of these legal proceedings, Chula Vista considered a proposed zone change to allow communal households in residential zones. Land use study was conducted which culminated in a planning department report concluding communal households due to their large number of residents are more appropriate in an R-3 rather than in an R-1 zone.

On May 14, 1975, a final environmental impact report was submitted by the environmental review committee and the City of Chula Vista planning department. This report concluded "[t]he establishment of communal households, subject to the controls of the proposed zoning text amendment,[2] will have no apparent significant adverse impacts at this level of specificity. The review of each site proposed will disclose any impact which is not apparent at this time. The slight increase in traffic, noise, and population can be controlled at the level which is commonly associated with residential neighborhoods." But the report also warned:

---

[2]The proposed zoning text amendment would regulate communal households in the following ways:

*"Impact*

"The establishment of communal households in single family neighborhoods has reportedly created congestion in the parking situation. It is also possible that such households, if not regulated could result in the overcrowding of sngle family dwelling units, creating a danger to the health, safety and welfare of the residents therein."

The report concluded the proposed zoning text amendment "[s]ubject to the controls imposed by the zoning text amendment, the establishment of communal households in single family neighborhoods will have an insignificant impact on the community's infrastructure," to wit, schools, open space, fire and police, waste disposal, utilities/energy, general government support and transportation/access.

The Council also had before it the report of Mr. Lu Quinny, chief associate planner in charge of investigating the extended family religious lifestyles within the R-1 zones of Chula Vista. He found there was substantial community opposition to communes based primarily upon "unarticulated feelings and fears." Mr. Quinny could see no difference in the land use impact between a related family of 10 and an unrelated family of 10 and concluded he could not discover any empirical evidence to justify denial of communal households as a conditional use. Following this study, the Council authorized households in R-3 zones as a conditional use but continued its restriction in R-1 zones.

Defendants were given six months to comply with the city code. During this six-month period, defendants applied for and obtained a conditional use permit to maintain their communal households in Chula Vista's R-3 zone. Defendants also continued to operate their communal households in R-1 zones after the six-month grace period. After noticed hearing, the Council found the various communes within the R-1 zones violated the city's zoning ordinances, declared them to be a public nuisance and authorized this court action.

1. Each household would require a conditional use permit in any residential zone.
2. Parking. One off-street space per vehicle registered at the address or at least one space per bedroom.
3. 200 square feet of usable open space per resident.
4. Conformance to Housing Code for occupancy floor area ratio.
5. Proper licensing required if foster children or other persons referred by a county agency are living in the household.
6. Continuing compliance with performance standards regarding noise and glare, and with city code sections covering nuisances such as disturbances, rubbish and weeds.
The exact details of the amendment adopted in 1976 is examined in II, *infra.*

## DISCUSSION

## I

■ The challenged Chula Vista municipal ordinance No. 19.24.011 contains a restrictive "rule of three." It requires in the R-1 zone (where Pagard and his codefendants live) all occupants of a house in which they reside be members of a "family." Section 19.04.092 defines a "family" as individuals who are related by blood, marriage or adoption, or an unrelated group of not more than three persons.

The California Supreme Court in *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436], held a similar ordinance (a restrictive "rule of five") unconstitutional, as violating the right of privacy guaranteed by the California Constitution, article I, section 1. The Supreme Court stated: "We...hold invalid the distinction effected by the ordinance between (1) an individual or two or more persons related by blood, marriage, or adoption, and (2) groups of more than five other persons." But the court observed: "We do not here address the question, How many people should be allowed to live in one house? (Cf. § 28.87.030(4b) of the ordinance, which concerns density and prohibits '[i]ncrease in the number of persons...which has a detrimental effect on the surrounding community')." We here confront that precise unanswered question.

*Adamson* factually involved 12 adults living in a 24-room, 10-bedroom, 6-bathroom house in a single-family, one-acre (43,560 sq. ft.) minimum lot size zone of the City of Santa Barbara. The house had a large yard, a new private driveway and a wall to shield 12 vehicles from the neighborhood. The Supreme Court stated there was no evidence of overcrowding. (P. 128.)

In contrast, the record in this case reflects not only one but several communal households with average occupancy of 11 to 12 persons with a range from 4 to 24 persons. The 12 households in question are in the R-1, single family zone and are located on lots ranging in area from 5,980 square feet to 10,500 square feet. The average number of parking spaces is four. In contrast to the Adamson house, overcrowding is inevitable in most of these houses.

The Supreme Court pointed out the way to attain the municipality's stated goals by means that are "less restrictive of freedom" than is the

"rule of five," stating: "'[R]esidential character' can be and is preserved by restrictions on transient and institutional uses (hotels, motels, boarding houses, clubs, etc.). Population density can be regulated by reference to floor space and facilities. Noise and morality can be dealt with by enforcement of police power ordinances and criminal statutes. Traffic and parking can be handled by limitations on the number of cars (applied evenly to all households) and by off-street parking requirements. *In general, zoning ordinances are much less suspect when they focus on the use than when they command inquiry into who are the users*, [citation]." (*City of Santa Barbara v. Adamson, supra*, 27 Cal.3d 123, 133.)

In short, *Adamson* does not preclude an ordinance "designed to prevent overcrowding, which may be a legitimate zoning goal." (P. 132.) Nor does the *Adamson* decision preclude Chula Vista from redefining "family" to specify a concept more rationally and substantially related to the legitimate aim of maintaining a family style of living.

"For example, in New Jersey a valid regulation of single-family dwellings would be 'a reasonable number of persons who constitute a *bona fide* single housekeeping unit.' (*Berger v. State* (1976) 71 N.J. 206 . . .; see also *State v. Baker, supra*, 405 A.2d 368, 371-372: 'The fatal flaw in attempting to maintain a stable residential neighborhood through the use of criteria based upon biological or legal relationships is that such classifications operate to prohibit a plethora of uses which pose no threat to the accomplishment of the end sought to be achieved. Moreover, such a classification system legitimizes many uses which defeat that goal. . . . As long as a group bears the "generic character of a family unit as a relatively permanent household," it should be equally as entitled to occupy a single family dwelling as its biologically related neighbors. *City of White Plains* [v. *Ferraiolo* (1974) 34 N.Y.2d 300, 306 . . .].' (Cf. *Incorp. Village of Freeport v. Association, etc.* (1977) 94 Misc.2d 1048 . . . .)" (*City of Santa Barbara v. Adamson, supra*, 27 Cal.3d 123, 134; fn. omitted.)

From the foregoing precepts and examples we derive these conclusions:

(1) The right of privacy possessed by Pagard and his co-occupants is not unlimited or boundless in scope. Pagard's neighbors also have a right of privacy. They have an equal right not to have their privacy dis-

turbed or invaded by noise, pollutants, overcrowding, and overuse of facilities. We have here, in contrast to *Adamson*, two or more juxtaposed rights to privacy, not just a single right of privacy. When such rights are in conflict, the municipality, through its zoning laws, may legislate to prevent one member of the community in exercise of a conceded right of privacy from doing harm to others, from infringing upon another's equal right to be left alone. An untrammeled right to live in an overcrowded dwelling may produce evil somewhere else. Therefore the community is warranted in interfering with that liberty to the extent reasonably necessary to prevent the harm reasonably contemplated.

(2) Chula Vista may enact a properly drawn ordinance regulating the number of occupants "[to prevent] overcrowding, minimiz[e] traffic and parking congestion, and [avoid] undue financial burden on [the Chula Vista] school system." (*Moore* v. *East Cleveland* (1977) 431 U.S. 494, 499-500 [52 L.Ed.2d 531, 537-538, 97 S.Ct. 1932].) An ordinance which limits population density directly, tying the maximum permissible occupancy in a dwelling to the habitable floor area is one specifically addressed to the problem of overcrowding. (*Id.*, at p. 500, fn. 7 [52 L.Ed.2d at p. 538].)

(3) The Chula Vista ordinance here under consideration (§ 19.04.092) (as well as the Santa Barbara "rule of five") has but at most a tenuous relationship to the alleviation of the problems mentioned. While the governmental interest articulated in support of the ordinance by Chula Vista is most legitimate and warrants regulation, yet these constitutional permissible ends are not served in any substantial way by the challenged ordinance. (See *Adamson, supra*, 27 Cal.3d pp. 132-133.) We therefore hold section 19.04.092 invalid.

II

In 1976 (pending this litigation) Chula Vista enacted an ordinance authorizing group residences in R-3 zones based upon a conditional use permit renewable every three years. That ordinance (§ 19.04.105) defines group residences as "a dwelling or part thereof where meals and/or lodging are provided or shared by more than three persons, excluding servants, who are not related by blood, marriage, or adoption. (Ord. 1697, § 2, 1976.)"

Ordinance section 19.58.172 further regulates and limits "group residences" in this fashion:

"A. Density. The maximum number of residents allowed in a group residence shall be determined by calculating the number of dwelling units which would be allowed on the site under R-3 district regulations and multiplying that number by the average family household size per unit (1.94 based on 1975 census data). Note: Calculations shall be rounded to the nearest whole number.

"B. Parking. Parking requirements shall be calculated on the basis of R-3 standards for one bedroom apartment units (resident and guest). The planning commission may increase the number of spaces required based on the facts presented in the conditional use permit application. Tandem parking shall be prohibited.

"C. Separation. Upon review of each conditional use permit application, the planning commission shall consider the number of group residences and the distance between them in determining the need for an additional group residence.

"D. Garage Conversions. In structures used for group residence, garage conversions shall be prohibited.

"E. Compliance with R-3 Standards. Group residences shall comply with all of the ordinance requirements as set forth in the R-3 zone. Open space shall be calculated on the basis of four hundred square feet times the number of units which could be constructed under R-3 regulations.

"F. Code Compliance (Other). A structure used as a group residence shall comply with the requirements of the latest effective Uniform Housing Code and Fire Code.

"G. License. Proper licenses shall be obtained by anyone living in the group residence.

"H. Bathrooms. There shall be a minimum of one bathroom for every three bedrooms or fraction thereof, but not fewer than one for every six persons or fraction thereof.

"I. Periodic Inspection. City inspectors (building, fire and zoning) shall inspect each group residence from time to time, but at least twice yearly, to determine compliance with the conditional use permit and code requirements.

"J. Time Period. The issuance of a conditional use permit shall be valid for a period of three years, at the end of which time the planning commission shall review the operation of the use for compliance with all conditions. In the interim period, violations of any condition cited, or receipt of verified complaints, will constitute grounds for review and possible revocation of the permit by the planning commission. (Ord. 1697 § 2, 1976.)"

This ordinance does appear facially to take direct aim at the problem of overcrowding and its multiple attendant health, safety problems. It does attempt to reach the municipality's stated goals by "means that are less restrictive of freedom" than is the "rule of three." It is relevant and rationally related to control of noise, traffic and parking congestion. However, it addresses the problem of overcrowding by tying maximum permissible occupancy by unrelated persons to the number of separate dwellings which would be allowed on such a lot under R-3 regulations. Such number of dwellings are to be multiplied by a factor of 1.94 persons (based upon the 1975 census data) to arrive at the maximum number of unrelated residents allowed.

This ordinance fails to meet the standards set forth in *Adamson, supra,* 27 Cal.3d 123, in several respects. First, the ordinance focuses upon "who are the users" (*id.,* p. 133) not the uses to which the dwelling is put. The ordinance again distinguishes between the biological and the unrelated "family" in favor of the biological family. In effect the ordinance creates a restrictive "rule of six" applicable to the unrelated coinhabitants where three single dwelling units are the maximum number allowed on one lot in an R-3 zone.

Secondly, the ordinance does not limit population density generally —only the unrelated "family" numbers are circumscribed. Nor does the ordinance regulate population density by reference to floor space and facilities. This ordinance like the Santa Barbara "rule of five" has but a most casual relation to alleviation of an overcrowding problem. On its face it does not appear to have been designed to prevent overcrowding except possibly in the "unrelated" households.

The ordinance has other infirmities. The free exercise of the constitutional right of privacy is—in the R-3 zone—placed in the hands of the Chula Vista Planning Commission to "consider" the number of group residents and the distance between them in order to "determine need." If this body—based upon standards not appearing in the ordinance—find there is a "need" for additional group residences, then the free exercise of this constitutional right is limited in time to three years, when the commission will "review" the operation.

Concerning this conditional use permit approach to the exercise of a constitutional right, *Adamson* (27 Cal.3d at p. 135) observed: "The city's contention that, pursuant to those and other rules, appellants should seek a permit lacks merit. Troubling questions arise with respect to (1) the justification for requiring that permit procedures be 'exhausted' when the constitutional attack on the ordinance is meritorious [citation], (2) the reasonableness of requiring that appellants not reside in a one-family zone, [and] (3) the great breadth of city officials' discretion to deny the permit, . . ." And Justice Brennan in his concurring opinion in *Moore* v. *East Cleveland, supra*, 431 U.S. 494, 512-513 [52 L.Ed.2d 531, 545-546], criticized a similar procedure: "[T]he existence of the variance procedure serves to lessen neither the irrationality of the definition of 'family' nor the extent of its intrusion into family life-style decisions.

". . . . . . . . . . . . . . . .

". . . We have now passed well beyond the day when illusory escape hatches could justify the imposition of burdens on fundamental rights."

The brief submitted does not suggest any rational basis for this clear interference with the exercise of a constitutional right. Furthermore, the inspection requirement (twice yearly) lacks any rational base.

We conclude Chula Vista's ordinance (§ 19.04.108) is invalid; the same deficiencies debilitating the "rule of three" ordinance, together with the additional specified defects, requires the group residence ordinance to be declared unenforceable.

Our finding of defects denying enforcement of section 19.04.108 does not in any way preclude or prohibit Chula Vista's enactment of an appropriately drawn ordinance, having due regard for the constitutional barriers to attain the municipality's laudable stated goal to protect and

promote family style living. The means "less restrictive of freedom" may include for example a redefinition of "family" to specify a concept more rationally and substantially related to the legitimate aim of maintaining a family style of living. Such definition of family should treat a "group that bears the generic" characters of a family unit as a relatively permanent family household on an equal basis with the blood related family and thus should be equally entitled to occupy a single-family dwelling as its biologically related neighbor.

Nor does our conclusion of invalidity of the present ordinance preclude Chula Vista by properly drawn ordinance from regulating the number of occupants to prevent overcrowding, minimize parking and traffic congestion, to forestall overburdening of its waste and sewage disposal systems and to avoid undue financial burden on its school system and other public use facilities within the community.

Such appropriately drawn ordinance may and should address the population density problem directly by tying maximum permissible occupancy in a dwelling to objective standards such as across-the-board minimum floor space per person requirement, person per quantum of open space, persons per a bedroom or bathroom, or any other generally accepted standard which defines "overcrowding."[3] In *Moore v. East Cleveland, supra,* 431 U.S. 494, Justice Stevens (concurring) stated (p. 520, fn. 16 [52 L.Ed.2d p. 550]): "Of course, a community has other legitimate concerns in zoning an area for single-family use including prevention of overcrowding in residences and prevention of traffic congestion. A community which attacks these problems by restricting the composition of a household is using a means not reasonably related

---

[3]See the United States Department of Housing and Urban Development "Housing Management" Manual (4351.1 Rev. Oct. 15, 1974) for HUD Multifamily Projects where these minimum-maximum limits on person occupancy in relation to number of bedrooms are established:

| Number of Bedrooms | Number of Persons | |
| --- | --- | --- |
| | Minimum | Maximum |
| 0 | 1 | 2 |
| 1 | 1 | 2 |
| 2 | 2 | 4 |
| 3 | 4 | 6 |
| 4 | 6 | 8 |

(P. 34.) "These limits are intended to provide for varying needs without over-crowding...." (P. 35.)

to the ends it seeks to achieve. See *Des Plaines* v. *Trottner*, 34 Ill.2d, at 435, 436, 216 N.E.2d, at 118. To prevent overcrowding, a community can certainly place a limit on the number of occupants in a household, either in absolute terms or in relation to the available floor space. Indeed, the city of East Cleveland had on its books an ordinance requiring a minimum amount of floor space per occupant in every dwelling. See *Nolden* v. *East Cleveland City Comm'n*, 12 Ohio Misc. 205, 232 N.E.2d 421 . . . ."

The United States Supreme Court, however, has held an ordinance limiting occupancy in a dwelling to members of a single family—and defining the "family" narrowly so as to exclude certain categories of blood relatives—violates the Fourteenth Amendment to the federal Constitution. (*Moore* v. *East Cleveland, supra*, 431 U.S. 494 (*passim*).) The plurality held (p. 499 [52 L.Ed.2d p. 537]): "When a city undertakes such intrusive regulation of the family, neither *Belle Terre* [*supra*, 416 U.S. 1] nor *Euclid* [*Euclid* v. *Ambler Realty Co* (1926) 272 U.S. 365 (71 L.Ed. 303, 47 S.Ct. 114, 45 A.L.R. 1016)] governs; the usual judicial deference to the legislature is inappropriate. 'This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.'"

These overriding federal constitutional principles must be reckoned with in any legislative attempt to apply the constitutional standards regarded as applicable in land use cases following *Euclid Realty Co.* v. *Ambler, supra.*[4]

## III

Between the federal Scylla as defined in *Moore* v. *East Cleveland, supra*, 431 U.S. 494, and the State of California's Charybdis as exemplified in the *Adamson, supra*, 27 Cal.3d 123, decision, few options would appear to remain open to the city desiring to retain and promote "family values" and "family needs." The enactment of a yet more restrictive across-the-board limitation on population density within R-1

---

[4]*Euclid* held land-use regulations violate the due process clause of the Fourteenth Amendment if they are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." (272 U.S. at p. 395 [71 L.Ed. at p. 314].) The federal cases have emphasized the general welfare is not to be narrowly understood; it embraces a broad range of governmental purposes. (See *Berman* v. *Parker* (1954) 348 U.S. 26 [99 L.Ed. 27, 75 S.Ct. 98].) But the cases have not departed from the requirement that the government's chosen means must rationally further some legitimate state purpose.

zones is not out of constitutional bounds—mindful, however, of the federal constitutional ban on any interference with "[t]he tradition of uncles, aunts, cousins and especially grandparents sharing a household along with parents and children. . . ." (*Moore v. East Cleveland, supra,* 431 U.S. p. 504 [52 L.Ed.2d p. 541].)[5]

Moreover, closing-the-barn-door-after-the-horse-is-out measures are still in place. Excess noise and immorality are regulated by police power ordinances and criminal statutes. Overuse of streets, traffic and parking problems are to be handled by limitation of number of cars and ultimately if the overuse of property is injurious to health, indecent or offensive to the senses or obstructs the free use of another's property so as to interfere with the comfortable enjoyment of life or property then such matters may by court process be abated (Civ. Code, § 3479).

Furthermore, the United States Supreme Court, in *Village of Belle Terre, supra,* 416 U.S. 1, has assured us: "A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman v. Parker, supra*. The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people." (P. 9 [39 L.Ed.2d p. 804].)

And the United States Supreme Court in *Berman v. Parker, supra,* 348 U.S. 26, reaffirms these sociological verities: "Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost unsufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.

". . . It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (*Id.,* at pp. 32-33 [99 L.Ed. at pp. 37-38].) And see *Nolden v. East Cleveland City*

---

[5]This overhanging barrier to any density limits in absolute terms may be but an insubstantial shadow in view of the model "atomic" family.

*Commission* (1966) 12 Ohio Misc. 205 [41 Ohio Ops.2d 291, 232 N.E.2d 421, 425, 426], for an excellent exposition of the factual base of these conclusions.

We do not read *City of Santa Barbara* v. *Adamson, supra*, 27 Cal.3d 123, as abandoning the profound truths that underlie and compel continuing approval of land use planning or as precipitating a wholesale invalidation of land use controls thus endangering the validity of zoning laws and city and regional planning. We are required to find the challenged ordinances invalid yet would urge Chula Vista not to abandon its goal of providing relatively quiet, wide streets with less traffic, fewer people, a pleasant and reasonably safe environment in which families might raise their children, thus meet family needs, promote family values. These lawful, most laudable purposes need pursuit by means of most carefully drawn, evenhanded ordinances.

## IV

The trial court here found—based upon undisputed evidence of violation of the Chula Vista "rule of three" ordinance that defendants' household constituted a public nuisance. This court's declaring the ordinance(s) invalid requires reversal but does not preclude a future finding that as a matter of fact an overcrowded residence may be a nuisance as defined by law (Civ. Code, § 3479). As was pointed out by the Supreme Court in *City of Bakersfield* v. *Miller* (1966) 64 Cal.2d 93, 99 [48 Cal.Rptr. 889, 410 P.2d 393]: "Although this court has thus held that 'nuisance' is a term for the Legislature to define, the semantics of Civil Code section 3479 provide little guide in ascertaining the degree of danger which must be present for a condition or an activity to be considered a nuisance. Almost all human activity involves some risk, and in circumstances in which Civil Code section 3479 is the only applicable statute, considerable judicial discretion has been allowed in determining whether an alleged danger is sufficiently serious to justify abatement." The Supreme Court cited the then (1966) California Administrative Code, title 8, section 17200.65 "which is a part of the state housing regulations, provides that overcrowding, insufficient ventilation and illumination, inadequate plumbing and other similar conditions within certain buildings shall be deemed public nuisances." (Pp. 99-100.)

Absent, however, any legislative act declaring overcrowding a nuisance per se, proof is required beyond the mere fact of the existence of the overcrowded dwelling to authorize the finding of a nuisance.

(Civ. Code, § 3479; *Helix Land Co.* v. *City of San Diego* (1978) 82 Cal.App.3d 932, 949 [147 Cal.Rptr. 683]; *City of Bakersfield* v. *Miller, supra,* 64 Cal.2d 93, 99.)

"[I]ssue finding rather than issue determination is the pivot upon which the summary judgment law turns." (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62].) Such factual matters as here tendered cannot be resolved by summary judgment process but only upon trial of these factual issues.

Judgment reversed.

Brown (Gerald), P. J., and Cologne, J., concurred.