[No. D046702. Fourth Dist., Div. One. Sept. 15, 2006.]

COLONY HILL, Plaintiff and Respondent, v.
MASOOD GHAMATY, Defendant and Appellant.

1158

**COUNSEL**

Rutan & Tucker, Stephen A. Ellis and Gerard M. Mooney, Jr., for Defendant and Appellant.

Hecht Solberg Robinson Goldberg & Bagley, Jerold H. Goldberg and Joshua A. Sonné for Plaintiff and Respondent.

OPINION

**McCONNELL, P. J.**—Defendant Masood Ghamaty appeals a judgment for plaintiff Colony Hill on its declaratory relief action. Ghamaty contends the trial court erred by finding the serial rental of rooms in his condominium violated Colony Hill's restriction limiting the home's use to single-family dwelling purposes, and also contends the use restriction is unreasonable and may not be maintained. We affirm the judgment and discuss this issue in part 1 of this opinion.

Ghamaty also contends the court improperly granted Colony Hill contractual attorney fees under Civil Code section 1717. In part III of this opinion we dismiss the attorney fees issue for lack of jurisdiction because Ghamaty did not file a notice of appeal from the postjudgment order on the matter.

## FACTUAL AND PROCEDURAL BACKGROUND

Colony Hill, a common interest subdivision located in the Mount Soledad area of La Jolla, California, consists of 40 condominiums, or "lots," owned by the residents. Colony Hill is managed by the board of governors (the Board) of the homeowners association. Colony Hill is governed by a declaration of covenants, conditions and restrictions (the Declaration), as amended in 1983. The two relevant paragraphs of the Declaration read as follows:

"2.6 Each Lot shall be improved, *used and occupied for private, single-family dwelling purposes only*, and no portion thereof nor any portion of the Common Area shall be used for any commercial purpose whatsoever." (Italics added.)

"2.7.8 Each Owner shall have the right to lease his [or her] Lot, provided the following conditions are satisfied: (a) each such lease shall be in writing and shall be submitted to the Board if requested; (b) each lease shall provide that the tenant shall be bound by and obligated to the provisions of this Declaration, the Bylaws and the rules and regulations promulgated by the Board and shall further provide that any failure to comply with the provisions of such documents shall be a default under the lease; (c) the name of each person residing upon a Lot pursuant to any such lease shall be provided to the Board; and (d) no Owner shall lease his [or her] Lot for transient or hotel purposes."

In 2000 Ghamaty became an owner of a four-bedroom, three-bathroom home at Colony Hill. Ghamaty occupies the home himself, and he has also rented rooms to six persons at various times, for periods of between two months and two years. Ghamaty charged rents of between $300 and $550 per

month, plus a share of the utilities. Each renter had the exclusive use of a bedroom and a bathroom, and the nonexclusive use of the living room and kitchen. The shortest-term renter was a cousin of Ghamaty's, but the other renters were unrelated to him. The rental agreements were oral and Ghamaty did not notify Colony of his tenants' names.

In early 2002 the Board notified Ghamaty it had learned he had one or more renters at his home in violation of the Declaration's requirement that it be used only as a single-family dwelling. The Board demanded that Ghamaty "return the property to a private single-family dwelling status immediately." Ghamaty disagreed with the Board, taking the position he could rent rooms to whomever he wished under paragraph 2.7.8 of the Declaration. The parties exchanged more correspondence on the matter to no avail.

In a May 2003 letter, the Board notified Ghamaty a resident had complained about a party at his residence, during which guests parked in no-parking areas and blocked driveways and loud music was played. The letter stated that if the Board received any additional complaints of excessive noise it would require "that all non-family members cease living at your house." In a July 2003 letter, the Board notified Ghamaty about some type of incident with one of his renter's cars. The letter reminded Ghamaty that homes were to be used for single-family purposes only and "suggest[ed] that you or your father sell the house and you move to a neighborhood where renters are allowed."

On July 17, 2003, Ghamaty appeared at a Board meeting. A resident voiced concerns about parking issues, renters and a loud party at Ghamaty's home. The resident complained that Ghamaty's renting out rooms was a commercial enterprise the Declaration does not allow. Ghamaty told the Board he had spoken with an attorney regarding the single-family residence language in the Declaration, and Ghamaty "considers his renters as family." The Board approved a motion finding that renting or leasing to multiple occupants constitutes a commercial enterprise not allowed under the Declaration.

The Board meeting did not resolve the matter, and in April 2004, after unsuccessfully seeking binding arbitration, Colony Hill sued Ghamaty for breach of the Declaration, injunctive relief and declaratory relief. A bench trial was held on February 25, 2005. In lieu of live testimony, the parties stipulated to certain facts and exhibits and submitted the matter for a tentative judgment before presenting closing arguments. In his trial brief, Ghamaty relied on the San Diego Municipal Code's definition of "family," which is "two or more persons related through blood, marriage, or legal adoption . . . or unrelated persons who jointly occupy and have equal access to all areas of a dwelling unit and who function together as an integrated economic unit." (San Diego Mun. Code, § 113.0103.)

In its tentative ruling, the court found Ghamaty's rentals violated the Declaration. The court determined that under paragraphs 2.6 and 2.7.8[1] of the Declaration the "only commercial activity allowed is the right to lease a unit under specific conditions which [Ghamaty] failed to meet." The court relied on the San Diego Municipal Code definition that Ghamaty submitted, and determined that by renting rooms he was not using the home for single-family purposes. The court ruled that under the municipal code definition, Ghamaty "may lease his entire unit to tenants who are responsible for the entire unit jointly and severally and who function as an integrated economic unit; i.e.[,] one lease whereby all tenants are jointly and severally responsible for all obligations under the lease, including rent."

The court explained that if Ghamaty's position were accepted, "one of the tenants may be violating the Rules and Regulations by emanating loud noise from his bedroom and [Colony Hill] could only enforce the rule against that individual person rather than all tenants of one unit. Other dwellers of the unit could claim no violation as they had no responsibility for the acts in the one bedroom. [Colony Hill] is not required to relate to each dweller as though [Ghamaty] were operating an apartment building within the unit." The ruling further states that Colony Hill "is entitled to a copy of a written lease whereby each occupier (competent adult) agrees under one lease document to follow the [Declaration], By-laws, and Rules and Regulations of [Colony Hill] jointly and severally as to the entire unit and common areas and it is entitled to the names of all the dwellers of the unit. [Colony Hill] is also entitled to one lease document under which all competent adult dwellers are an 'integrated economic unit[,]' i.e. jointly and severally liable for the lease payment for the unit."

After arguments, the court confirmed its tentative ruling and adopted it as a statement of decision. The court entered judgment for Colony Hill on April 18, 2005, which declared Ghamaty was in violation of paragraphs 2.6 and 2.7.8[2] of the Declaration, and permanently enjoins him "from renting his unit to multiple renters other than in compliance with the declaration of this Court."

Colony Hill then moved as the prevailing party for $29,987.50 in attorney fees, under paragraph 6.6 of the Declaration and section 1717 of the Civil Code, and $1,729.60 in other costs. The court awarded the full amount requested.

---

[1] The tentative ruling erroneously cites paragraph 2.7.9 of the Declaration.

[2] The judgment also erroneously cites paragraph 2.7.9 of the Declaration.

## DISCUSSION

### I

### *Single-family Dwelling*

Ghamaty cursorily contends that because he lives in his Colony Hill home and is "fully subject" to the Declaration's rules and regulations, the trial court erred by finding he was not using it for single-family dwelling purposes within the meaning of paragraph 2.6 of the Declaration. He asserts he did not violate the Declaration by merely engaging in the "incidental renting of rooms in his home to friends [he] considers to be like 'family.' "

Ghamaty cites no authority from any jurisdiction to support the notion that the seriatim renting of rooms in one's home constitutes single-family dwelling use. "Where a point is merely asserted by counsel without any argument of or authority for its proposition, it is deemed to be without foundation and requires no discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 [86 Cal.Rptr. 906], disapproved on another ground in *People v. Compton* (1971) 6 Cal.3d 55, 60, fn. 3 [98 Cal.Rptr. 217, 490 P.2d 537]; see *People v. Sierra* (1995) 37 Cal.App.4th 1690, 1693, fn. 2 [44 Cal.Rptr.2d 575].)

In any event, Ghamaty's contention lacks merit. The court used the definition of "family" that Ghamaty submitted for its consideration, which in relevant part is "unrelated persons who jointly occupy and have equal access to all areas of a dwelling unit and who function together as an *integrated economic unit*." (San Diego Mun. Code, § 113.0103, italics added.) The parties have not cited us to any definition of "integrated economic unit" in the context of residential living arrangements, and we have found none in our independent research. Under the facts here, however, the term cannot reasonably be interpreted to include Ghamaty and his renters. Ghamaty adduced no evidence he had any prior relationship with five of six of the renters, or that any of the renters had any prior relationship with each other. Ghamaty conceded he found one of the renters by placing an ad in the newspaper. The renters all had separate oral month-to-month agreements and they lived at Ghamaty's home for various periods, with some of the renters not even present during the terms of other renters. One of the renters was a cousin of Ghamaty, but he lived at the home only sporadically for two months.

The term "integrate" means "to form, coordinate, or blend into a functioning or unified whole." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 650.) The mere payment of rent and a share of the utilities to Ghamaty did not blend the group into any type of unified whole. Beyond Ghamaty's self-serving statement at the Board meeting that he considered his renters

"family," he produced no evidence suggesting he shared meals with or had any type of relationship with the renters, with the exception of the familial relationship with his cousin. The court properly ruled that by renting out rooms Ghamaty was not using his home for single-family dwelling purposes.

II

*Reasonableness of Use Restriction*

A

*Applicable Law*

■ Ghamaty's principal challenge is to the legality of the Declaration's restriction of use to single-family dwelling purposes. The matter is governed by the provisions of the Davis-Stirling Common Interest Development Act, which was enacted in 1985. (Civ. Code, § 1350.) Civil Code section 1354, subdivision (a) provides the "covenants and restrictions in the declaration shall be enforceable equitable servitudes, *unless unreasonable*, and shall inure to the benefit of and bind all owners of separate interests in the development." (Italics added.)

"Use restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 372 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*).) "The restrictions on the use of property in any common interest development may limit activities conducted in the common areas as well as in the confines of the home itself. [Citations.] Commonly, use restrictions preclude alteration of building exteriors, limit the number of persons that can occupy each unit, and place limitations on—or prohibit altogether—the keeping of pets." (*Id.* at p. 373.)

■ In *Nahrstedt*, the court was required to determine what standard or test governs the enforceability of recorded equitable servitudes in common interest developments, a matter of legislative intent. (*Nahrstedt, supra*, 8 Cal.4th at pp. 375, 378–379.) The court held: "An equitable servitude will be enforced unless it violates public policy; it bears no rational relationship to the protection, preservation, operation or purpose of the affected land; or it otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (*Id.* at p. 382.)

The court also held that by using the term "unless unreasonable" in Civil Code section 1354, subdivision (a), the Legislature created a presumption of reasonableness and shifted the burden of proving otherwise to the party challenging the use restriction. (*Nahrstedt, supra,* 8 Cal.4th at p. 380.) Further, the court held "the reasonableness or unreasonableness of a condominium use restriction that the Legislature has made subject to [Civil Code] section 1354 is to be determined *not* by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole." (*Nahrstedt, supra,* 8 Cal.4th at p. 386.)[3]

B

*Ghamaty's Showing*

1

To prevail, Ghamaty was required to prove the single-family dwelling use restriction is "arbitrary, that it is substantially more burdensome than beneficial to the affected properties, or that it violates a fundamental public policy." (*Nahrstedt, supra,* 8 Cal.4th at p. 386.) Further, he must do so in the context of Colony Hill as a whole. (*Id.* at p. 387.)

■ Ghamaty contends the permanent injunction violates his right of privacy under the California Constitution, article I, section 1.[4] "[A] land-use restriction in violation of a state constitutional provision presumably would conflict with public policy" (*Nahrstedt, supra,* 8 Cal.4th at p. 387), and the question is whether the right to privacy implicitly guarantees owners in a common interest development the right to rent out rooms in their homes under circumstances such as those here. (*Ibid.*)

As the Supreme Court has held, "the privacy provision in our state Constitution does not 'encompass all conceivable assertions of individual rights' or create 'an unbridled right' of personal freedom. [Citation.] The legally recognized privacy interests that fall within the protection of the state Constitution are generally of two classes: (1) interests in precluding dissemination of confidential information (' "informational privacy" '); and (2) interests in making personal decisions or in conducting personal activities free of interference, observation, or intrusion (' "autonomy privacy" '). [Citation.]

---

[3] In *Nahrstedt, supra,* 8 Cal.4th 361, the court concluded a use restriction that prohibited cats and dogs, but allowed domestic fish and birds, was reasonable. (*Id.* at p. 369, fn. 3, & p. 386.)

[4] That provision states: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

The threshold question in deciding whether 'established social norms safeguard a particular type of information or protect a personal decision from public or private intervention,' . . . must be determined from 'the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballots arguments accompanying the Privacy Initiative.' " (*Nahrstedt, supra,* 8 Cal.4th at p. 387, citing *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35–36 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

Ghamaty relies on *City of Santa Barbara v. Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436] (*Adamson*), and its progeny, *City of Chula Vista v. Pagard* (1981) 115 Cal.App.3d 785 [171 Cal.Rptr. 738] (*Pagard*). Those cases, however, are inapplicable.

In *Adamson,* a city ordinance required that all occupants of a home be members of a family, and it defined family in relevant part as a group not to exceed five persons, excluding servants, " 'living together as a single housekeeping unit in a dwelling unit.' " (*Adamson, supra,* 27 Cal.3d at p. 127.) The appellant's household consisted of a group of 12 unrelated adults who lived in a 24-room, 10-bedroom, 6-bathroom home. The evidence showed the residents "have become a close group with social, economic, and psychological commitments to each other. They share expenses, rotate chores, and eat evening meals together. . . . Emotional support and stability are provided by the members to each other; they enjoy recreational activities such as a trip to Mexico together; they have chosen to live together mainly because of their compatibility." (*Id.* at pp. 127–128.)

In *Adamson,* the court held the city lacked a compelling public interest in restricting communal living to groups of five or fewer persons. The court found the ordinance's "rule-of-five" did not promote the stated goals of " 'serv[ing] the public health, safety, comfort, convenience and general welfare and . . . provid[ing] the economic and social advantages resulting from an orderly planned use of land resources, and . . . encourag[ing], guid[ing] and provid[ing] a definite plan for future growth and development' " of the city, or prohibiting activities of a commercial nature and developing and sustaining a suitable environment " 'for family life where children are members of most families.' " (*Adamson, supra,* 27 Cal.3d at pp. 131–132.)

The court noted the "rule-of-five is not pertinent to noise, traffic or parking congestion, kinds of activity, or other conditions that conceivably might alter the land-use-related 'characteristics' or 'environment' " of the city. (*Adamson, supra,* 27 Cal.3d at pp. 132–133.) The court found the city's stated goals could be satisfied by less restrictive means, such as regulating population

density based on floor space and facilities, regulating noise by enforcing ordinances and criminal statutes, and regulating traffic and parking by limiting the number of cars permitted a household and by offstreet parking requirements. (*Adamson, supra,* 27 Cal.3d at p. 133.)

In *Pagard, supra,* 115 Cal.App.3d 785, a city ordinance prohibited more than three unrelated persons from living together. At issue there were several communal households that were occupied by between four and 24 unrelated persons. (*Id.* at p. 791.) This court, in accordance with *Adamson,* held the ordinance was invalid as it had "but at most a tenuous relationship to the alleviation of the problems mentioned," such as overcrowding, minimizing traffic and congestion and avoiding undue financial burden on the school system. (*Id.* at p. 793.)

*Adamson* and *Pagard,* however, involved governmental action, in contrast to this case. In *Schmidt v. Superior Court* (1989) 48 Cal.3d 370 [256 Cal.Rptr. 750, 769 P.2d 932] (*Schmidt*), the court upheld the constitutionality of a mobilehome park owner's rule that excluded persons under the age of 25 from residing in the park. The court rejected the plaintiffs' argument, based on *Adamson, supra,* 27 Cal.3d 123, that the rule violated their right of privacy. The court explained the restriction in *Adamson* "was a *state-imposed* rule directly limiting an individual's right to live with whom he or she wanted; in [that] case, a governmental body had made the substantive decision to limit individual living arrangements within a community." (*Schmidt, supra,* 48 Cal.3d at p. 388.) Further, the court explained a park owner's authority to adopt an age-based housing rule "arises from its general common law property rights in the mobilehome park . . . . Nothing in *Adamson* . . . suggests that constitutional guarantees are violated by the enactment of a statute which simply recognizes the continuing existence of a private property owner's authority in this respect." (*Ibid.*)[5]

 Indeed, Ghamaty states in his opening brief that the "clear rule is . . . that the *State* may not utilize its power to interfere with a person's choice of cohabitants, absent some compelling public interest or reasonable necessity for doing so." (Italics added.) Ghamaty cites no authority for the proposition that a private developer may not impose on its project use restrictions such as those in paragraphs 2.6 and 2.7.8 of the Declaration. "A decision is authority only for the point actually passed on by the court and directly involved in the

---

[5] In *Schmidt,* Civil Code former section 798.76 was at issue. It provided that the " 'management [of a mobilehome park] may require that a purchaser of a mobilehome which will remain in the park, comply with any rule or regulation limiting residence to adults only.' " (*Schmidt, supra,* 48 Cal.3d at p. 379.)

case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93]; see *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)

Moreover, *Adamson* and *Pagard* pertained to the *number* of unrelated persons allowed to reside together. In *Adamson*, the evidence showed the residents were committed to each other and engaged in communal living by sharing expenses, chores, meals and travel. (*Adamson, supra,* 27 Cal.3d at pp. 127–128.) The court found the city's ordinance defining "family" as including only five or fewer related persons living as " 'a single housekeeping unit in a dwelling' " (*id.* at p. 127) violated the plaintiffs' right to live together as an "alternate family" because of the numerical limitation. (*Id.* at pp. 128, 134.)

Similarly, in *Pagard*, the unrelated persons lived in "religious family households" or "communal households." (*Pagard, supra,* 115 Cal.App.3d at pp. 787, 788.) The city's definition of family included " 'a group of not more than three persons . . . who need not be related, living in a dwelling unit as a single housekeeping unit and using common cooking facilities.' " (*Id.* at p. 789.) The families lived in single housekeeping units, and this court struck down the ordinance because of the numerical limitation. (*Id.* at p. 793.)

In contrast, the injunction here includes no numerical limitation. Rather, it precludes Ghamaty from using his home for purposes other than a single-family dwelling, and in determining the meaning of "family," the court used the definition Ghamaty submitted. Again, that definition is "unrelated persons who jointly occupy and have equal access to all areas of a dwelling unit and who function together as an *integrated economic unit.*" (San Diego Mun. Code, § 113.0103, italics added.) As discussed, Ghamaty presented no evidence he and his various renters functioned together as an integrated economic unit. The injunction's requirements that Ghamaty may enter into only one lease of his property at a time, and that lessees shall be jointly and severally liable for the lease payment, are reasonably intended to ensure the lessees are an "integrated economic unit." The court employed practical means to preclude the serial renting of rooms, which, when considered on a larger scale, could destroy the single-family character of Colony Hill.

Ghamaty asserts the injunction "impermissibly speaks to the relationship between the residents of [his] home, rather than to the use of the [r]esidence itself." (Original underscoring.) In both *Adamson* and *Pagard*, however, the

residents had relationships with each other and they satisfied the ordinances' requirements that they constitute single housekeeping units. Ghamaty, by providing the court with a definition for "family," effectively conceded he could not lease his property unless he and his lessees formed an "integrated economic unit." (San Diego Mun. Code, § 113.0103.) In *Pagard,* this court explained the city was free to enact "an appropriately drawn ordinance, having due regard for the constitutional barriers to attain the municipality's laudable stated goal to protect and promote family style living. [This] . . . may include for example a redefinition of 'family' to specify a concept more rationally and substantially related to the legitimate aim of maintaining a family style of living. Such definition of family should treat a 'group that bears the generic' characters of a family unit as a relatively permanent family household on an equal basis with the blood related family and thus should be equally entitled to occupy a single-family dwelling as its biologically related neighbor." (*Pagard, supra,* 115 Cal.App.3d at pp. 796–797.)

■ Ghamaty's situation did not pertain to "family" in any sense of the word. Rather, he engaged in commercial activity prohibited by paragraph 2.6 of the Declaration, and the injunction is rationally related to Colony Hill's right to maintain its family character by prohibiting uses other than for single-family dwelling purposes. Ghamaty did not meet his burden of showing the Declaration's use restriction is unreasonable. (*Nahrstedt, supra,* 8 Cal.4th at p. 378.)

2

■ Additionally, Ghamaty contends the injunction violates his right to contract under the state Constitution. Article I, section 9 of the California Constitution provides that a "bill of attainder, ex post facto law, or *law impairing the obligation of contracts* may not be passed." (Italics added; see also U.S. Const., art. I, § 10 ["No state shall . . . pass any . . . law impairing the obligation of contracts"].) " 'A law or ordinance which substantially impairs a contractual obligation nonetheless may be constitutional. As the United States Supreme Court has noted, "[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' [Citation.]" ' " (*Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1210 [28 Cal.Rptr.2d 822].)

"Although the federal contract clause has been interpreted to be 'directed only against impairment by legislation and not by judgment of courts' [citation], . . . the state contract clause has been construed also to apply to

judicial action." (*White v. Davis* (2003) 30 Cal.4th 528, 548 [133 Cal.Rptr.2d 648, 68 P.3d 74], citing *Bradley v. Superior Court* (1957) 48 Cal.2d 509, 519 [310 P.2d 634].) "[A] court cannot lawfully disregard the provisions of . . . contracts or deny to either party his [or her] rights thereunder." (*Bradley v. Superior Court*, at p. 519.)

Ghamaty concedes he has found no case applying the contracts clause in the context of a permanent injunction. He relies on *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048 [71 Cal.Rptr.2d 899], in which the issue was whether a retroactive statute impaired the right to contract. The court explained that under federal law there is a three-step analysis. "The first and threshold step is to ask whether there is any impairment at all, and, if there is, how substantial it is. [Citation.] If there is no 'substantial' impairment, that ends the inquiry. If there is substantial impairment, the court must next ask whether there is a 'significant and legitimate public purpose' behind the state regulation at issue. [Citation.] If the state regulation passes that test, the final inquiry is whether means by which the regulation acts are of a 'character appropriate' to the public purpose identified in step two." (*Id.* at pp. 1054–1055, citing *Energy Reserves Group v. Kansas Power & Light* (1983) 459 U.S. 400, 410–412 [74 L.Ed.2d 569, 103 S.Ct. 697].)

Ghamaty asserts the injunction destroys his "existing contractual relationships." In support, he cites stipulated facts that six persons rented rooms from him for various terms. He cites no evidence that when the injunction issued any rental agreements were in force. In a deposition held approximately seven months before trial, Ghamaty testified that within the following few weeks he was going to terminate the two existing rental agreements and become the sole occupant of his home.

Ghamaty also complains that the injunction precludes him from "entering into separate contracts and dictates specific terms under which [he] must contract." He essentially asserts the joint and several requirement of the injunction makes it impossible for him to rent out rooms as he did in the past. He claims it is unfair that he "would be required to locate renters willing to share liability for (a) the rent to be paid by all of the lessees and (b) any violations of [Colony Hill's] rules and regulations and the [Declaration]."

■ To any extent the three-part test discussed in *Barrett v. Dawson, supra*, 61 Cal.App.4th 1048 is arguably applicable in a judicial context, it is unhelpful to Ghamaty. The injunction does not substantially impair Ghamaty's contract right, because under paragraphs 2.6 and 2.7.8 of the Declaration he must use his home only for single-family dwelling purposes, and he has no right to rent out rooms of his home when he and the renters do not function as an "integrated economic unit," a definition he chose and the

court adopted. As the court concluded in *Nahrstedt, supra*, 8 Cal.4th at pages 383–384, "our social fabric is best preserved if courts uphold and enforce solemn written instruments [here the Declaration] that embody the expectations of the parties rather than treat them as 'worthless paper' . . . . Our social fabric is founded on the stability of expectation and obligation that arises from the consistent enforcement of the terms of deeds, contracts, wills, statutes, and other writings. To allow one person to escape obligations under a written instrument upsets the expectations of all the other parties governed by that instrument . . . that [it] will be uniformly and predictably enforced. [¶] The salutary effect of enforcing written instruments and the statutes that apply to them is particularly true in the case of the declaration of a common interest development."

## III

### *Attorney Fees*

Ghamaty contends the award of attorney fees to Colony Hill should be reversed because Colony Hill only partially prevailed on its claims against him, as it did not recover any damages, and the court refused its request for a declaration that it was entitled to approve any lessee of Ghamaty. Alternatively, Ghamaty asserts the fee award should be substantially reduced.

We conclude, however, that we lack jurisdiction to consider the matter because Ghamaty did not appeal the postjudgment order awarding attorney fees.[6] "An appellate court has no jurisdiction to review an award of attorney fees made after entry of the judgment, unless the order is separately appealed." (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 [114 Cal.Rptr.2d 898].) " '[W]here several judgments and/or orders occurring close in time are separately appealable (e.g., judgment and order awarding attorney fees), each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal.' " (*DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, 43 [99 Cal.Rptr.2d 366].)

The judgment here was entered on April 18, 2005, and it stated, "Award of attorney's fees and costs shall be determined by post-judgment application." On May 27, 2005, Colony Hill moved for an award of fees and costs; on June 17, Ghamaty filed a notice of appeal of the judgment, and it did not refer to the pending motion on attorney fees or otherwise address the issue; on July 29, the court issued a tentative ruling granting the motion, and on August 8,

---

[6] The parties did not address this issue, and we requested supplemental briefing from them on it. We have taken their responses into consideration.

the court affirmed its ruling. Ghamaty did not then file a notice of appeal from the order on fees.

■ In asserting his notice of appeal includes the postjudgment order on attorney fees, Ghamaty relies on *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993 [3 Cal.Rptr.2d 654] (*Grant*). In *Grant*, the judgment expressly awarded attorney fees to certain parties, and the amounts of the awards were left blank for later insertion by the court clerk. Thereafter, the trial court set the amounts of the awards. The Court of Appeal rejected the argument it lacked jurisdiction over the fee issue, holding that "when a judgment awards costs and fees to a prevailing party and provides for the later determination of the amounts, the notice of appeal subsumes any later order setting the amounts of the award." (*Id.* at p. 998.)

Here, in contrast to *Grant*, the judgment did not expressly award attorney fees to Colony Hill. Rather, it left the issues of entitlement and amount for later proceedings. In considering the applicability of the *Grant* exception, the court in *DeZerega v. Meggs, supra,* 83 Cal.App.4th at page 44, explained: "The issue . . . is not whether fees were ultimately recovered 'as costs' but whether the *entitlement* to fees was *adjudicated* by the original judgment, leaving only the issue of amount for further adjudication." Were we to extend *Grant* in the manner Ghamaty urges, a prevailing party would never have to file a separate appeal from a postjudgment order granting attorney fees. That, of course, would be contrary to law.

Although notices of appeal must be liberally construed (Cal. Rules of Court, rule 1(a)(2)), we cannot construe Ghamaty's notice of appeal to include the postjudgment order on fees. "The rule favoring appealability in cases of ambiguity cannot apply where there is a clear intention to appeal from only part of the judgment or one of two separate appealable judgments or orders. [Citation.] 'Despite the rule favoring liberal interpretation of notices of appeal, a notice of appeal will not be considered adequate if it completely omits any reference to the judgment [or order] being appealed.' " (*Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1990) 220 Cal.App.3d 35, 47 [269 Cal.Rptr. 228].)

Ghamaty also contends we should consider the merits of the attorney fees issue because Colony Hill addressed the merits and did not raise the jurisdictional issue, and thus it would suffer no prejudice. Prejudice to a party, however, is not the test of whether we have jurisdiction to consider an issue.

## DISPOSITION

The judgment is affirmed. The purported appeal of the attorney fees award is dismissed. Colony Hill is entitled to costs on appeal.

O'Rourke, J., and Irion, J., concurred.

On October 11, 2006, the opinion was modified to read as printed above.